RESOLUCIÓN
A la solicitud de certiorari del Colegio de Abogados de Puerto Rico, “no ha lugar”.
La Ley Núm. 121 de 13 de octubre de 2009 (4 L.P.R.A. secs. 772 n., 773-775, 780-781, 783, 2011 y 2021) y la Ley Núm. 135 de 6 de noviembre de 2009 (4 L.P.R.A. secs. 772 n., 773-774 y 777 — 778) son un ejercicio válido de la facul-tad constitucional de la Asamblea Legislativa. Tal y como razonó el Tribunal de Apelaciones, éstos no son estatutos de proscripción. Estas leyes no son otra cosa que el ejerci-cio por la Asamblea Legislativa de su facultad para regular la estructura y el funcionamiento del Colegio de Abogados, las mismas facultades que la Asamblea Legislativa empleó al crear el Colegio mediante la Ley Núm. 43 de 14 de mayo de 1932 (4 L.P.R.A. see. 771 et seq.). Fue esa ley de 1932, y no este Tribunal, la que creó el Colegio de Abogados e hizo compulsoria su membresía.
Ninguna de esas leyes usurpó el poder de este Tribunal para reglamentar la profesión de la abogacía en Puerto Rico. Tampoco conflige con lo que hemos pautado al respecto. La variación de la colegiación —de obligatoria a voluntaria— no elimina el Colegio, no contradice ninguna pauta establecida en el ejercicio de nuestro rol como ente que reglamenta la profesión legal ni soslaya el axioma de la separación de poderes, base de nuestro sistema republicano de gobierno. Véase Colegio de Abogados de P.R. v. Schneider, 112 D.P.R. 540, 546 (1982) (La preeminencia de la acción judicial en este campo no significa que es nula la *137 legislación al respecto que no contradiga las pautas que este Tribunal haya dictado).
La colegiación voluntaria tampoco está en tensión con el derecho constitucional a la libertad de asociación. Art. II, Sec. 6, Const. P.R., L.P.R.A., Tomo 1. Por el contrario, es la colegiación compulsoria de una clase profesional la que crea una fricción inevitable con la libertad de asociación de los afectados. Por ello, esa limitación significativa de la libertad a no asociarse es constitucional solamente si el Estado demuestra un interés gubernamental apremiante que la hace necesaria. E.g., NAACP v. Button, 371 U.S. 415, 438 (1963) (descripción de este escrutinio).(1)
Ahora bien, toda vez que la legislación que nos ocupa va dirigida a hacer voluntaria la membresía en el Colegio de Abogados de Puerto Rico y que no se ha coartado el libre ejercicio de expresión de la organización, que reconocimos en Colegio de Abogados de PR. v. Schneider, supra, no es necesaria nuestra intervención en este asunto. Las leyes impugnadas garantizan el ejercicio libre de los derechos constitucionales de expresión y asociación de todas las par-tes en este caso.
En cambio, se ordena la publicación de la sentencia uná- *138 nime del Tribunal de Apelaciones de 18 de mayo de 2010, objeto de este recurso, panel integrado por su Presidenta, la jueza Bajandas Vélez, y los jueces Cortés Trigo y Feli-berti Cintrón. Esa Sentencia expone de manera correcta el derecho aplicable.
Número: KLCE201000212
KLCE201000247
Resuelto: 18 de mayo de 2010

Notifíquese por teléfono y “fax”, y por la vía ordinaria.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente Señor Hernández Denton emitió un voto disidente. La Jueza Asociada Señora Fiol Matta disntió de la decisión tomada por la mayoría del Tribunal y expediría el recurso por los motivos expresados tanto en el voto disidente del Juez Presidente Señor Her-nández Denton como en el voto particular disidente de la Juez Asociada Señora Rodríguez Rodríguez. La Juez Aso-ciada Señora Rodríguez Rodríguez emitió un voto particular disidente.
(.Fdo.) Aida Ileana Oquendo Graulau

Secretaria del Tribunal Supremo

*144 Panel integrado por su presidenta, la Juez Bajandas Vélez, el Juez Cortés Trigo y el Juez Feliberti Cintrón.
SENTENCIA
Los peticionarios recurren de la resolución dictada por el Tribunal de Primera Instancia, Sala de San Juan (TPI), el 10 de febrero de 2010, notificada al día siguiente. Me-diante esta, se denegaron las mociones de desestimación y sentencia sumaria presentadas por los peticionarios.
Analizados los escritos de las partes y los documentos adjuntos, resolvemos expedir el auto de certiorari solici-tado y revocar el dictamen recurrido.
I
El 22 de diciembre de 2009, el recurrido, Colegio de Abo-gados de Puerto Rico, por sí, representado por su presi-dente Arturo Luis Hernández González, y en representa-ción de sus miembros (el recurrido o el Colegio), presentó una acción titulada “Petición en el TPI” (la Petición) contra el Gobernador del Estado Libre Asociado de Puerto Rico, Hon. Luis Fortuno Burset, el Estado Libre Asociado de Puerto Rico (el Estado), la Oficina de Administración de los Tribunales y la Directora Administrativa de los Tribunales, Hon. Sonia Ivette Vélez Colón (la Directora Adminis-trativa). En síntesis, solicitó que se emitieran los recursos extraordinarios de entredicho provisional, interdicto preli-minar e injunction permanente para prohibir la implanta-ción de las Leyes Núms. 121 de 13 de octubre de 2009 (4 L.P.R.A. secs. 772 n., 773-775, 780-781, 783, 2011 y 2021) (la Ley 121) y 135 de 6 de noviembre de 2009 (4 L.P.R.A. secs. 772 n., 773-774 y 777-778) (la Ley 135) (en conjunto, las Leyes) y se dictara sentencia declaratoria en la cual se decretara que las Leyes eran inconstitucionales.
*145 El recurrido dividió sus alegaciones en la petición en ocho reclamaciones. En estas sostuvo que las Leyes eran inconstitucionales por los fundamentos siguientes: (1) por violar las cláusulas constitucionales sobre el “Bill of Attainder”; (2) por usurpar el poder inherente que el Tribunal Supremo de Puerto Rico (Tribunal Supremo) posee para reglamentar la profesión de la abogacía; (3) por violar el principio de separación de poderes y pretender revocar, mediante fiat legislativo, las decisiones judiciales de Colegio de Abogados de P.R. v. Schneider [I], 112 D.P.R. 540 (1982), y Colegio de Abogados v. Schneider [II], 117 D.P.R. 504 (1982); (4) por incumplir varios requisitos sobre la re-dacción y el trámite de las leyes; (5) por violar los derechos de libertad de expresión y asociación del Colegio; (6) infrin-gir los derechos de libertad de expresión y libertad de aso-ciación de los miembros del Colegio; (7) violar el derecho del Colegio a la igual protección de las leyes por carecer de un nexo racional entre la medida legislativa y un fin legí-timo del Estado, y (8) menoscabar la relación contractual entre el Colegio y sus miembros. Además, el mismo día el recurrido presentó una Moción y Memorando de Derecho en Apoyo a Solicitud Urgente de Entredicho Provisional y Vista de Injunction Preliminar.
El 23 de diciembre de 2009, el TPI emitió una orden y citación. En ella dispuso que: (1) no expedía el entredicho provisional; (2) citaba a las partes a una audiencia sobre injunction preliminar y permanente para el 14 de enero de 2010; (3) las partes tenían que reunirse en o antes del 8 de enero de 2010 para redactar un documento conjunto en el que incluyeran estipulaciones de hechos, identificaran los documentos y la prueba que se proponían utilizar en la audiencia e identificaran las controversias de derecho, y (4) que el documento conjunto indicado y cualquier moción dispositiva debía presentarse en o antes de 13 de enero de 2010. El 23 de diciembre de 2010, el Estado fue emplazado y se le entregó copia de la Petición y de la orden y citación.
*146 El 28 de diciembre de 2009 el Ledo. John E. Mudd (el interventor) presentó una moción en la que solicitó su in-tervención o, en la alternativa, que se le permitiera presen-tar un alegato en calidad de amicus curiae. Mediante una orden de 14 de enero de 2010, notificada el día 20 si-guiente, el TPI permitió su intervención.
El 30 de diciembre de 2009, el recurrido presentó dos mociones. Pidió que se emitiera una orden urgente para que la parte demandada presentara su contestación a la petición en o antes de 4 de enero de 2010 y una orden y citación a las Oficinas de los Presidentes y la Secretarías de los Cuerpos Legislativos para que produjeran ciertos documentos en o antes de 4 de enero de 2010.
El 13 de enero de 2010 el recurrido y el Estado presen-taron un Documento Conjunto en Cumplimiento de Orden (Documento Conjunto). En este incluyeron las estipulacio-nes siguientes:
1. Mediante la Ley Núm. 43 de 14 de mayo de 1932 (en adelante “Ley Núm. 43”) se crea bajo el nombre de Colegio de Abogados de Puerto Rico una entidad jurídica o corporación cuasi pública.
2. El Artículo 3 de la Ley Núm. 43, previo a ser enmendada, disponía el requisito de afiliación obligatoria al Colegio para ejercer la profesión de abogado en el Estado Libre Asociado.
3. El 13 de octubre de 2009, se aprobó el Proyecto de la Cámara Núm. 152, convirtiéndola en la Ley Núm. 121 (en adelante, “Ley Núm. 121”).
4. El 6 de noviembre de 2009, el Gobernador Luis G. For-tuño Burset firmó el Proyecto del Senado Núm. 338, promul-gándose así la Ley Núm. 135 (en adelante, “Ley Núm. 135”).
5. El Colegio de Abogados de Puerto Rico (en adelante “el Colegio”) es una entidad jurídica con capacidad de demandar y ser demandada.
6. El Recurrido Luis Fortuño Burse [t] es el Gobernador del Estado Libre Asociado de Puerto Rico y es responsable de cum-plir y hacer cumplir las leyes promulgadas por el Estado Libre Asociado de Puerto Rico, incluyendo, la Ley Núm. 121, según enmendada por la Ley Núm. 135.
7. La Oficina de Administración de Tribunales (en adelante “OAT”) es una entidad creada por ley para asistir al Juez Pre-sidente del Tribunal Supremo de Puerto Rico en la adminis- *147 tración del sistema judicial del País y es responsable de hacer cumplir los procedimientos administrativos establecidos para asegurar uniformidad, continuidad y eficiencia en la presta-ción de los servicios de la Rama Judicial, evaluar el impacto en el sistema de las medidas legislativas que pueden afectarlo y representar legalmente a la Rama Judicial.
8. La Hon. Sonia Ivette Vélez Colón, como Directora Admi-nistrativa de la Oficina de Administración de Tribunales, asiste al Juez Presidente en materia de la administración y funcionamiento de los tribunales en el País.
9. Una vez constituido el Colegio, los miembros aprobaron su Reglamento.
10. El Ledo. Arturo Luis Hernández González es el Presi-dente del Colegio, quien fue electo como tal mediante el voto mayoritario de los miembros del Colegio que asistieron a la Asamblea General celebrada en el mes de septiembre de 2008.
11. El 4 de noviembre de 2008, los candidatos a la Goberna-ción y Comisaría Residente en Washington del Partido Nuevo Progresista fueron electos en las urnas.
12. El 2 de enero de 2009, la Hon. Liza Fernández Rodríguez presentó el P. de la C. 152, el cual fue referido a la Comisión de lo Jurídico y de Ética de la Cámara en esa misma fecha.
13. El 31 de marzo de 2009, la Comisión de lo Jurídico y de Ética de la Cámara rindió su Informe en torno al P. de la C. 152 recomendando su aprobación con enmiendas.
14. Al día siguiente, 1ro de abril de 2009, la Cámara de Representantes aprobó con enmiendas el P. de la C. 152 me-diante 35 votos a favor y 15 votos en contra.
15. El Senado celebró vistas públicas sobre el P. de la C. 152 los días 25, 26 y 28 de agosto y 1 y 2 de septiembre de 2009.
16. El 13 de octubre de 2009, el Senado descargó el P. de la C. 152. La votación en el Senado fue 17 votos a favor y 8 en contra.
17. El 4 de febrero de 2009, el Presidente del Senado radicó el P. del S. 338.
18. El Senado no celebró vistas públicas en tomo al P. del S. 338.
19. El 5 de marzo de 2009, el Senado descargó y aprobó el P. del S. 338 sin enmiendas con 27 votos a favor y 1 abstención.
20. El 19 de octubre de 2009, la Comisión de lo Jurídico y de Ética de la Cámara rindió un Informe sobre el P. del S. 338, en virtud del cual recomendó su aprobación con enmiendas.
21. Ese mismo 19 de octubre de 2009, la Cámara aprobó el P. del S. 338 con enmiendas mediante votación dividida de 32 votos a favor y 11 votos en contra.
*148 22. El 26 de octubre de 2009, el Senado concurrió con las enmiendas de la Cámara mediante votación dividida de 19 votos a favor, 8 en contra y 1 abstención. Ese mismo día dis-puso que fuese enrolado.
23. El día 6 de noviembre de 2009, el recurrido Fortuño Burset firmó el P. del S. 338, convirtiéndolo en la Ley Núm. 135 de igual fecha.
24. El 24 de noviembre de 2009, el Colegio presentó una Petición en Acción de Jurisdicción Original ante el Tribunal Supremo en la que impugnó la validez y constitucionalidad de las Leyes Núm. 121 y 135. Mediante Resolución dictada el 9 de diciembre de 2009, el Tribunal Supremo decidió no ejercer jurisdicción sobre la referida Petición.
25. La OAT ha comenzado a tomar pasos encaminados a cumplir con las disposiciones de la[s] Leyes 121 y 135.
26. El 5 de enero de 2010, el Tribunal Supremo de Puerto Rico dictó Resolución 2010 TSPR 1.
27. Se estipula la autenticidad del Reglamento del Colegio.
28. Se estipula que las siguientes ponencias fueron presen-tadas a la Comisión de lo Jurídico de la Cámara de Represen-tantes:
a. Oficina de Administración de los Tribunales
b. Colegio de Abogados de Puerto Rico
c. Colegio de Arquitectos y Arquitectos Paisajistas de Puerto Rico
d. Departamento de Justicia
e. José Julio Díaz
f. Junta de Síndicos Facultad de Derecho Eugenio María de Hostos
g. Lie. Alfredo Castellanos
h. Lie. Carlos Mondríguez Torres
i. Lie. John E. Mudd
j. Lie. María Milagros Charbonier
k. Lie. Rafael Sánchez Hernández
l. Lie. Robert E. Schneider, Jr.
m. Unión Americana de Libertades Civiles (ACLU)
n. Lie. Luis Dávila Colón
29. Se estipula que las siguientes ponencias fueron presen-tadas a la Comisión de lo Jurídico del Senado:
a. Oficina de Administración de los Tribunales
b. Alianza de Líderes Comunitarios de PR - Jorge Oyóla
c. Asociación Americana de Juristas Cap. Puerto Rico - Hiram Lozada
d. Asociación de Industriales de PR - Lie. Roberto Monse-rrate Maldonado
*149 e. Asociación de Residentes Gladiolas Vive - Mirta Colón Pellecier
f. Carmen Iris Pillot López
g. Coalición Puertorriqueña contra la Pena de Muerte - Mariana Nogales
h. Colegio de Abogados de Puerto Rico - Lie. Arturo Her-nández González
i. Colegio de Cirujanos Dentistas de Puerto Rico - Dr. Noel J. Aymat
j. Colegio de Contadores Públicos Autorizados de Puerto Rico - CPA Rafael del Valle
k. Colegio de Diseñadores-Decoradores de Interiores de PR - Sr. Roberto Lucena Zabala
l. Colegio de Médicos Cirujanos de Puerto Rico - Dr. Eduardo Ibarra
m. Colegio de Químicos de Puerto Rico - Dr. Roberto Trinidad Pizarra
n. Colegio de Técnicos de Refrigeración y Aire Acondicio-nado de PR - Sr. Daniel Crespo
o. Comisión de Abogados Jóvenes del CAPR - Lie. Jeremiah Ocasio
p. Comisión de Derechos Civiles - Lie. Vance Thomas Rider
q. Consejo Interdisciplinario de Colegios y Asociaciones Profesionales - CICAP Sra. Marta Bravo Colunga
r. Delegación de Abogados de Aguadilla - Lie. Lissette Medina
s. Delegación de Abogados de Humacao - Lie. Waleska Delgado
t. Delegación de Abogados de Mayagüez - Lie. María del Carmen Gitany
u. Departamento de Justicia
v. Escuela de Derecho Eugenio María de Hostos - Lie. Orlando Pórtela Valentín
w. Escuela de Derecho Pontificia Universidad Católica de PR - Lie. Rosario del Pilar Fernández Vera
x. Escuela de Derecho Universidad de Puerto Rico - Lie. Guillermo Figueroa Prieto
y. Federación Americana de Abogados - Lie. George Harper
z. Federación Interamericana de Abogados, Cap. de PR - Lie. David Freedman
aa. Héctor R. Arroyo Aguilar - estudiante de derecho re-cién graduado
*150 bb. Hermandad de Empleados Exentos No Docentes de la Universidad de Puerto Rico - Wigberto Jiménez Rivera
cc. Instituto de Notariado Puertorriqueño - Lie. Luis Co-lón Ramery
dd. Jesús García Oyóla — representante clientela Servicios Legales de PR
ee. Lie. Alfredo Castellanos
ff. Lie. Anelie Cario Rivera
gg. Lie. Carlos del Valle Cruz - Centro de Paz y Justicia de las Américas
hh. Lie. Carlos Mondríguez Torres
ii. Lie. Carmelo Delgado Cintrón
jj. Lie. Celina Romany Siaca
kk. Lie. Doel Quiñones N[ú]ñez - Catedrático de la Es-cuela de Derecho de la Universidad Interamericana
11. Lie. Domingo Emanuelli
mm. Lie. Francis Daniel Nina Estrella
nn. Lie. Graciany Miranda Marchand
oo. Lie. Héctor Sostre Narváez - Tesorero de la Junta de Gobierno del Colegio de Abogados de PR
pp. Lie. John E. Mudd
qq. Lie. José E. González Borgos
rr. Lie. José Roberto Vega Díaz
ss. Lie. Julián Rivera Espinal (Comisión Caso Rosa Lydia Vélez vs. Depto. Educación)
tt. Lie. Luis E. Dubón III
uu. Lie. Manuel Quilichini
w. Lie. Noel Colón Martínez - Presidente Comisión para el Estudio del Desarrollo Constitucional de Puerto Rico
ww. Lie. Aníbal Vega Borges
xx. Lie. Antonio Fernós López Cepero
yy. Lie. Osvaldo Toledo Martínez
zz. Lie. Samuel Quiñones García
aaa. María Esther Santiago Fuentes
bbb. Pro Bono Inc. - Lie. Antonio Vidal
ccc. Sociedad Puertorriqueña de Planificación - Sr. Arse-nio D. Portu-Hamani
ddd. Unión de Abogados y Abogadas de Servicios Legales
30. Se estipula que los siguientes informes fueron descarga-dos por la Cámara de representantes:
a. Informe de 31 de marzo de 2009 de la Comisión de lo Jurídico y de Ética en torno al P. de la C. 152.
b. Informe de 19 de octubre de 2009 de la Comisión de lo Jurídico y de Ética en tomo al P. del S. 338. Apéndice, págs. 1442-1448.
*151 Además, en el “Documento Conjunto” el recurrido alegó que existía controversia en cuanto a “las intenciones de la legislatura al aprobar las Leyes 121 y 135, las expresiones realizadas por la Legislatura y el Gobernador sobre el particular, los efectos nocivos de las Leyes 121 y 135 sobre el Colegio y sus miembros, las actividades realizadas por el Colegio desde el 1986 hasta el presente, las posiciones ex-puestas por el Colegio en sus comparecencias ante la ONU y las circunstancias que rodearon el alquiler de las facili-dades del Colegio por parte de los familiares de Filiberto Ojeda Ríos para celebrar su velatorio”. Apéndice, pág. 1448.
Por su parte, el Estado alegó que la controversia plan-teada en el pleito era estrictamente de derecho, por lo que sólo se requería analizar las leyes impugnadas y la juris-prudencia aplicable. Sostuvo que no había controversia en cuanto a que esas leyes fueron aprobadas válidamente y la controversia no requería la presentación de prueba.
En cuanto a las controversias de derecho, el recurrido reiteró las reclamaciones contenidas en la Petición. El Es-tado adujo que el recurso extraordinario solicitado era im-procedente y reafirmó que la controversia de derecho se circunscribía a determinar si las referidas leyes eran cons-titucionalmente válidas.
De otra parte, el recurrido detalló catorce testigos y doce documentos que se proponía presentar en la audiencia. Por su parte, el Estado se reservó el derecho a utilizar cual-quier documento o testigo anunciado por el recurrido.
Asimismo, el 13 de enero de 2010 el interventor y el Estado presentaron por separado mociones de desestima-ción. En la Moción en Solicitud de Desestimación, el Es-tado alegó que acceder al pedido del recurrido implicaba intervenir indebidamente con las funciones del Primer Eje-cutivo y de la Asamblea Legislativa, en contravención a la doctrina de separación de poderes. Indicó que la determi-nación realizada por la Legislatura en cuanto a la falta de
*152 justificación de la afiliación compulsoria obedeció a un aná-lisis de juicio evaluativo y programático. Además, señaló que la Petición no era remediable mediante el recurso de injunction porque el Art. 678 del Código de Enjuiciamiento Civil, 32 L.P.R.A. see. 3524, establecía que no podía dic-tarse un interdicto para impedir la aplicación u observan-cia de cualquier ley o el cumplimiento de cualquier actua-ción autorizada por la Asamblea Legislativa a menos que se hubiera determinado por sentencia final, firme, inape-lable e irrevisable que esa ley o actuación autorizada por ley era inconstitucional o inválida, lo que no había ocurrido. Igualmente, sostuvo que no se cumplían los re-quisitos para la expedición de un injunction porque no existía un daño irreparable y el recurrido no había demos-trado las probabilidades de prevalecer, ya que no procedía lo aducido en cada una de las reclamaciones incluidas en la Petición, según detalladamente discutió.
En el señalamiento de 14 de enero de 2010, el recurrido inició el desfile de su prueba con la presentación de varios documentos(1) El Estado objetó esa prueba y las partes argumentaron sus posiciones. El TPI dejó sin efecto la con-tinuación de la audiencia pautada para el 15 de enero de 2010 y le concedió al recurrido hasta el 19 de enero de 2010 para oponerse a la solicitud de desestimación del Estado.
El 19 de enero de 2010, el recurrido presentó una Peti-ción Enmendada y Suplementaria (la Petición Enmen-dada). Además, el 21 de enero de 2010 presentó una Opo-sición a Solicitudes de Desestimación y una Moción para que se le Señale la Reanudación de Vista Consolidada de Injunction Preliminar y Permanente.
*153 El 27 de enero de 2010, el interventor presentó una Mo-ción de Sentencia Sumaria en Cuanto a Injunction Preli-minar y una Moción de Sentencia Sumaria en cuanto a los Méritos. No acompañó documento alguno con estas mociones.
Mediante la Orden de 10 de febrero de 2010, notificada el día siguiente, el TPI declaró “no ha lugar” la moción de desestimación del Estado y las mociones de sentencia su-maria del interventor sin esbozar fundamento alguno. Ade-más, permitió la Petición Enmendada, concedió al Estado y el peticionario hasta el 24 de febrero de 2010 para contes-tarla y señaló la continuación de la vista para los días 1 al 4 de marzo de 2010.
El 19 de febrero de 2010 el interventor presentó ante nos el recurso de certiorari núm. KLCE201000212. Señaló que se cometieron los errores siguientes:
Erró el TPI al denegar las mociones de desestimación y sen-tencia sumaria radicadas por los demandados y el interventor sobre los méritos de la Petición del Colegio.
Erró el TPI al denegar las mociones de desestimación y de sentencia sumaria radicada por los demandados y el interventor sobre la procedencia del injunction preliminar. Apéndice, pág. 910.
Además, el interventor acompañó con su recurso una moción en auxilio de jurisdicción. Mediante una resolución del mismo día, paralizamos los procedimientos ante el TPI y, como la orden recurrida carecía de los fundamentos ne-cesarios para ejercer nuestra función revisora, concedimos al TPI hasta el 26 de febrero de 2010 para que emitiera rma resolución en la cual incluyera los fundamentos para su decisión.
El 22 de febrero de 2010 el recurrido presentó una Mo-ción Urgente para que se Deje sin Efecto y de Inmediato de Orden de Paralización de los Procedimientos y para que se Deniegue la Expedición del Auto de Certiorari por Falta de Jurisdicción. El día siguiente le concedimos un término al interventor para expresarse.
*154 Por su parte, el 25 de febrero de 2010 el Estado presentó el recurso de certiorari núm. KLCE201000247. Señaló que se cometieron los errores siguientes:
Erró el tribunal de instancia al rechazar la postura del Estado en torno a que en el caso de autos resulta improcedente el recurso extraordinario del injunction a los fines de declarar las leyes en controversia inconstitucionales.
Erró el tribunal de instancia al no disponer sumariamente de una controversia, a pesar que la misma es de estricto derecho, esto es: si las leyes impugnadas son constitucionales. Apén-dice, pág. 510.
Mediante Resolución de 25 de febrero de 2010, entre otras determinaciones, consolidamos los recursos de certio-rari,, según lo solicitó el Estado y denegamos la moción urgente presentada por el recurrido. El 26 de febrero de 2010, el TPI emitió una “Resolución en Cumplimiento de Orden”, pero, debido a que consideramos que ésta no cum-plía con nuestra Resolución de 19 de febrero de 2010, dis-pusimos concederle un término adicional para que emi-tiera una Resolución en la que indicara los hechos en controversia y sus fundamentos para denegar las mociones de desestimación y de sentencia sumaria.
El 8 de marzo de 2010 el TPI emitió una “Segunda Reso-lución en Cumplimiento de Orden”. En ella indicó, esencial-mente, que las mociones de desestimación se habían conver-tido en inoficiosas porque se habían presentado antes de que se permitiera la Petición Enmendada y procedía que el Co-legio presentara su prueba sobre el daño irreparable y la violación de derechos constitucionales para poder resolver si procedía el remedio interdictal. Identificó unas catorce controversias que, por entender que eran de hechos,(2) *155 impedían desestimar el pleito.(3)
Mediante la Resolución de 10 de marzo de 2010, conce-dimos a los peticionarios hasta el 16 de marzo de 2010 para suplementar sus recursos y al recurrido hasta el 23 de marzo de 2010 para fijar su posición. El interventor pre-sentó su escrito el 15 de marzo y el Estado el suyo al día siguiente.
*156 El 23 de marzo de 2010, el recurrido presentó Escrito Fijando Posición. Mediante la Resolución de 25 de marzo de 2010 concedimos al recurrido hasta el 30 de marzo de 2010 para informar su posición en cuanto a todos los plan-teamientos de los peticionarios. El recurrido presentó su escrito el 5 de abril de 2010. Resolvemos.
II
Antes de examinar las reclamaciones del recurrido, es preciso evaluar el trámite procesal que ha seguido el caso en instancia. Según indicado, el TPI denegó la solicitud de entredicho provisional del recurrido e inició la celebración de la vista de injunction preliminar, en la cual el Colegio comenzó el desfile de su prueba. Además, el TPI denegó las solicitudes de desestimación del Estado y del interventor por entender que existían controversias de hechos que ameritaban una vista en su fondo. Incidió al así proceder.
La Regla 10.2(5) de Procedimiento Civil, 32 L.P.R.A. Ap. III, permite que una parte pueda solicitar la desestima-ción, de su faz, de una demanda, cuando en ésta no se expone una reclamación que justifique la concesión de un remedio. Este tipo de moción procede cuando de un exa-men de las alegaciones se desprende que la parte deman-dante no tendría derecho a remedio alguno según cuales-quiera hechos que puedan ser probados. Rivera v. Jaume, 157 D.P.R. 562, 584 (2002).
Al evaluar una solicitud de desestimación al amparo de la mencionada defensa, los tribunales deben aceptar como ciertas las alegaciones contenidas en la demanda y consi-derarlas de la manera más favorable a la parte demandante. García v. E.L.A., 163 D.P.R. 800, 814 (2005). De este modo, los tribunales tienen el deber de considerar si a la luz de la situación más favorable al demandante y resolviendo toda duda a favor de este, la demanda es sufi-ciente para constituir una reclamación válida. Pressure *157 Vessels P.R. v. Empire Gas P.R., 137 D.P.R. 497, 505 (1994). El tribunal tiene la facultad para dictar sentencia a base de una moción de desestimación fundamentada en la ci-tada Regla 10.2(5) de Procedimiento Civil, cuando de la moción no surge que exista controversia sustancial de hechos que requiera la celebración del juicio en su fondo. Montañez v. Hosp. Metropolitano, 157 D.P.R. 96, 102 — 104 (2002).
En este caso, el TPI decidió inicialmente celebrar la vista de injunction preliminar. Consideramos que tal curso de acción no era el correcto.
Ciertamente, como bien aduce el recurrido, el Art. 678(3) del Código de Enjuiciamiento Civil de 1933 (32 L.P.R.A. sec. 3524(3)) no impide que en este caso pueda emitirse un interdicto antes de que se resuelva por sentencia firme que las Leyes son inválidas. Pacheco Fraticelli v. Cintrón Antonsanti, 122 D.P.R. 229, 238 (1988); D. Rivé Rivera, Recursos Extraordinarios, 2da ed., San Juan, Ed. U.I.P.R, 1996, págs. 61-62. No obstante, no puede dictarse un interdicto para impedir la aplicación de una ley si pre-viamente no se ha resuelto que esta no es válida, aunque la determinación no sea firme como requiere el citado Art. 678(3), porque, de otro modo, se estaría impidiendo la apli-cación de un estatuto válido. Como se sabe, una ley es y se presume constitucional hasta que se resuelva lo contrario. Cerame-Vivas v. Srio. de Salud, 99 D.P.R. 45, 51 (1970).
Así, el TPI inicialmente debió adjudicar la sentencia de-claratoria solicitada por el recurrido, conforme lo estable-cido en la Regla 59 de Procedimiento Civil, 32 L.P.R.A. Ap. III. La Regla 59.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone que “[e]l Tribunal de Primera Instancia tendrá autoridad para declarar derechos, estados y otras relacio-nes jurídicas, aunque se inste o pueda instarse otro remedio”. Además, la Regla 59.2(a) de Procedimiento Civil, 32 L.P.R.A. Ap. III, establece que “[t]oda persona ... cuyos derechos ... fuesen afectados por un estatuto ... podrá so- *158 licitar una decisión sobre cualquier divergencia en la inter-pretación o validez de dichos estatutos ... y además que se dicte una declaración de los derechos, estado u otras rela-ciones jurídicas que de aquéllos se deriven”.
En este sentido, el Tribunal Supremo reiteradamente ha resuelto que la sentencia declaratoria es el mecanismo adecuado para adjudicar controversias de índole constitucional. Suárez v. C.E.E. I, 163 D.P.R. 347, 354 (2004); Asoc. de Periodistas v. González, 127 D.P.R. 704, 723-724 (1991). Por lo tanto, inicialmente el TPI tenía que adjudicar la sentencia declaratoria y, de proceder ésta a favor del recurrido, dictar el remedio interdictal correspondiente.
Ciertamente, el TPI podía celebrar una vista evidencia-ría si existían controversias de hechos para adjudicar la sentencia declaratoria. Regla 59.5 de Procedimiento Civil, 32 L.P.R.A. Ap. III. No obstante, como discutiremos, acep-tando como ciertas las alegaciones del recurrido, no existen controversias de hechos que impidan desestimar su re-clamo y sólo se requiere adjudicar si, como cuestión de de-recho, la legislación impugnada por el Colegio es válida. Las controversias de hechos que el TPI indicó que le impe-dían resolver las solicitudes de desestimación son, en su gran mayoría, controversias de derecho y las que no lo son se refieren a controversias de hechos no materiales. Ade-más, las alegaciones de la Petición son similares a las de la Petición Enmendada, por lo que al admitirse esta no se convirtieron en inoficiosas las solicitudes de desestimación. Por lo tanto, procedían las solicitudes de desestimación y así debió disponer del pleito el TPI.
III
A. En la Primera Reclamación, el recurrido alega que las Leyes 121 y 135 son inconstitucionales porque infrin-gen las disposiciones de la Constitución de Estados Unidos *159 (Constitución Federal) que prohíben los estatutos de pros-cripción o leyes para condenar sin la celebración de juicio conocidas como bills of attainder.
El Art. I, Sec. 9(3) de la Constitución Federal dispone, en lo pertinente: “[n]o Bill of Attainder or ex post facto Law shall be passed.” U.S.C.A. Const. Art. I, Sec. 9(3). Asi-mismo, el Art. I, Sec. 10(1) de la Constitución federal esta-blece, en parte: “[n]o State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts ....’’U.S.C.A. Const. Art. I, Sec. 10.
En nuestra jurisdicción el caso Pueblo v. Figueroa Pérez, 96 D.P.R. 6, 9 (1968), es el único en el cual el Tribunal Supremo ha resuelto un cuestionamiento sobre la validez de una ley al amparo de la disposición contra un estatuto de proscripción. El apelante alegó que la See. 4 de la Ley Núm. 220 de 11 de marzo de 1948, conocida como Ley de la Bolita (Ley 220), 33 L.P.R.A. sec. 1250, era un estatuto de proscripción según el Art. 1, Sec. 9(3) de la Constitución federal, supra, y se rechazó su planteamiento.
El Tribunal Supremo explicó que un “estatuto de proscripción es una forma que utiliza el poder soberano para castigar a una persona designada por su nombre o a miembros determinables de un grupo de personas”. Pueblo v. Figueroa Pérez, supra, pág. 9 (citando a United States v. Lovett, 328 U.S. 303 (1946)). Añadió que “[o]tra característica de tal estatuto es que se niega el derecho a un juicio en que las personas afectadas pudieran obtener una adjudicación de sus derechos”. Id.
Conforme a lo anterior, el Tribunal Supremo concluyó que como la Ley 220 fue promulgada con el propósito de poner fin a un mal que permitía a individuos al margen de la ley explotar sin misericordia a las personas más necesi-tadas y exprimir cuantiosos beneficios monetarios, esta le-gislación no contenía disposición alguna que fuera de la naturaleza de un bill of attainder. Además, se indicó que en Pueblo v. Matías Castro, 90 D.P.R. 528 (1964), se había *160 resuelto que la citada See. 4 de la Ley 220 era constitu-cional.
De otra parte, en la jurisdicción federal se ha resuelto que la cláusula constitucional contra un estatuto de pros-cripción prohíbe al Congreso aprobar una ley que legislati-vamente determine culpa e inflija castigo sobre un indivi-duo en particular sin las garantías y protecciones de un juicio en su fondo. Nixon v. Administrator of General Services, 433 U.S. 425, 468 (1977).(4)
El caso que mejor refleja la intención original de la pro-hibición contra un estatuto de proscripción es Cummings v. Missouri, 71 U.S. 277 (1867). En este, el Tribunal Federal indicó que un estatuto de proscripción es un acto legisla-tivo que inflige castigo sin juicio e incluye cualquier acto legislativo que quite la vida, libertad o propiedad de una persona particular o un grupo de personas porque el legis-lador los considera culpables de una conducta que merece castigo. íd., pág. 298. Así, concluyó que una ley que prohibía a las personas practicar ciertas profesiones, a menos que juramentaran que nunca habían pertenecido a organi-zaciones contra el Estado, era un castigo por estar ante-riormente asociadas a la Confederación y violaba la cláu-sula constitucional contra un estatuto de proscripción. íd., pág. 323.
Asimismo, en United States v. Lovett, supra, pág. 315, el *161 Tribunal Federal expresó que un estatuto de proscripción prohíbe los actos legislativos, sin importar su forma, que aplican ya sea a personas nombradas como a los miembros fácilmente identificables de un grupo, de tal manera que se les cause castigo sin un proceso judicial. Conforme a lo anterior, resolvió que una ley de confiscación de salarios a unos trabajadores del Estado que se les acusaba de ser comunistas era un estatuto de proscripción. Id., págs. 315-316.
En algunos casos el Congreso ha impuesto un castigo a grupos cuyos miembros individuales se podían identificar sin mucha dificultad. Por ejemplo, en United States v. Brown, 381 U.S. 437 (1965), una ley federal estableció como delito para los miembros del Partido Comunista que sirvieran como oficiales de un sindicato. El propósito de la ley fue proteger la economía nacional, minimizando el pe-ligro de las huelgas políticas. El Tribunal Federal invalidó la ley como un estatuto de proscripción porque no todos los miembros del Partido Comunista incitaron las huelgas po-líticas, también podrían incurrir en esa conducta rebeldes no comunistas y le correspondía a la Rama Judicial juzgar la culpabilidad de una persona particular (separación de poderes). Además, expresó que el castigo en un estatuto de proscripción sirve a varios propósitos: retributivo, rehabi-litador, disuasivo y preventivo. Id., pág. 458.
De un análisis de la jurisprudencia citada se puede con-cluir que la prohibición constitucional contra un estatuto de proscripción fue desarrollada para prevenir la supresión de las minorías que voluntariamente pertenecían a organi-zaciones con fines políticos mediante legislación. D. Kairys, The Bill of Attainder Clauses and Legislative and Administrative Suppression of “Subversives”, 67 Colum. L. Rev. 1490, 1499 (1967). En este sentido, se ha definido un esta-tuto de proscripción como:
... [Legislation which imposes punishment in the broad sense explained in Brown without judicial trial upon people identi *162 fied either as individual (by name or other distinctive characteristics) or as members, associates of or sympathizers with any voluntary organization having political goals. Courts should give “political” a generous reading, bearing in mind the wide range of active and potentially active interest groups and the great variety of questions that can become involved in politics; “political goals” need not be goals currently at the center of political debate .... Their central vice, however, is that they arrogate to the legislature the functions of the judiciary, and thus deprive citizens of procedural protections. (Enfasis suplido.) íd., pág. 1499.
En este caso, el recurrido sostiene que las Leyes 121 y 135 son estatutos de proscripción porque imponen al Cole-gio castigos sin juicio
... al decretar la descolegiación automática de todos los abo-gados y abogadas, despojan al Colegio de sus miembros, pro-híben al Colegio de promover “en forma directa o indirecta, religión ni idea política alguna”, impiden que el Colegio y cual-quier otra entidad que esté relacionado al Colegio puedan re-cibir fondos provenientes de la venta de sellos y/o del Tribunal Supremo para la provisión de asistencia legal a indigentes en casos civiles y le proscriben a “[l]os departamentos, agencias, oficinas, entidades, instrumentalidades, corporaciones públi-cas o municipios del Gobierno de Puerto Rico ... pagar o remi-tir pagos al Colegio de Abogados por concepto de cuotas u otros cargos por estar afiliados al Colegio de Abogados de Puerto Rico” mas le permiten a todas esas entidades públicas a pagar la cuota que el Tribunal Supremo tenga a bien fijar. Petición Enmendada, págs. 15-16.
Acorde con lo anterior, aduce que las Leyes deben inva-lidarse porque son estatutos de proscripción. No le asiste la razón.
Según indicado, el estatuto de proscripción es un acto legislativo que impone un castigo sin juicio a una persona o un grupo de personas que pertenecen voluntariamente a una organización que tiene objetivos políticos. Kairys, supra, pág. 1499. Esta no es la situación del caso de autos.
Primeramente, el Colegio no es una organización voluntaria. Como se sabe, la Ley 43 estableció la afiliación *163 compulsoria, no voluntaria, al Colegio de todos los aboga-dos y abogadas para que pudieran ejercer la profesión legal en Puerto Rico. Art. 3 de la Ley 43 (4 L.P.R.A. sec. 774).
Además, el Art. 13 de la Ley 43 (4 L.P.R.A. sec. 772 (ed. 2003) impuso al Colegio las obligaciones siguien-tes:
1) Cooperar al mejoramiento de la administración de [la] justicia;
2) evacuar los informes y consultas que el Gobierno le re-clame;
3) defender los derechos e inmunidades de los abogados ...;
4) promover las relaciones fraternales entre sus miembros, y
5) sostener una saludable y estricta moral profesional entre los asociados.
Entre las funciones del Colegio se encuentran: (1) la facultad de adoptar, con la aprobación del Tribunal Supremo, los cánones del Código de Etica Profesional que re-girán la conducta de los abogados y las abogadas; (2) insti-tuir procedimientos de desaforo ante esta Corte; (3) crear montepíos, sistemas de seguros y fondos especiales; (4) or-ganizar una fundación “para instrumentar sus programas de servicio a la comunidad y a la profesión”, y (5) “ejercitar las facultades incidentales que fueren necesarias o conve-nientes a los fines de su creación ...”. Art. 2 de la Ley 43 (4 L.P.R.A. sec. 773); Colegio de Abogados de P.R. v. Schneider [I], supra, pág. 545.
De lo anterior surge que los propósitos principales para los cuales se creó el Colegio no fueron políticos, sino para promover el mejoramiento de la administración de la justicia, defender los derechos y las inmunidades de los abogados y las abogadas, enriquecer la profesión legal e instrumentar programas de servicio a la comunidad y a los abogados y las abogadas. Véase, además, Colegio de Abo-gados v. Schneider [II], supra, págs. 513-518. Por lo tanto, como el Colegio no es una organización creada con fines *164 políticos, tampoco aplica la prohibición constitucional contra un estatuto de proscripción.
De todos modos, opinamos que en el presente caso tam-poco aplica la cláusula constitucional contra estatutos de proscripción, porque las Leyes 121 y 135 no constituyen castigos punitivos al recurrido por su pasada conducta y expresiones. Veamos.
En primer lugar, la Exposición de Motivos de la Ley 121 revela que la Asamblea Legislativa entendió necesario que todos los miembros de la profesión legal gozaran de la misma representatividad en la entidad que los agrupa. Por ello, razonó que para propender al mejor desarrollo de la profesión legal en Puerto Rico no se justificaba la afiliación obligatoria de los abogados y las abogadas al Colegio y ésta se cambió a voluntaria. http://www. lexjuris.com/lexlex/Leyes2009/lexl2009135.htm
Por su parte, la Ley 135 cambió el procedimiento de votación para elegir al Presidente y a los delegados por acumulación y regionales de la Junta de Gobierno del Colegio y enmendó varias de las disposiciones de las Leyes 43 y 121 para concederle al Tribunal Supremo discreción para cobrar una cuota a los abogados y las abogadas, fijar la cuantía de esta, disponer las entidades a las que podían otorgarse los fondos devengados de esta cuota y que las entidades públicas podían pagar la referida cuota al Tribunal Supremo.
En la Exposición de Motivos de la Ley 135, la Asamblea Legislativa reconoció que, por la naturaleza estatutaria del Colegio, resultaba necesario que este fuera un foro repre-sentativo de la diversidad de ideas y pensamientos entre los abogados y las abogadas, y se respetaran las diferen-cias de criterios y opiniones en distintos aspectos. Asi-mismo, destacó las necesidades de reevaluar los mecanis-mos vigentes que databan de 1932 para la selección del Presidente y de los delegados por regiones y acumulación de la Junta de Gobierno y garantizar la participación de *165 todos los abogados y las abogadas que voluntariamente pertenecieran al Colegio en la toma de decisiones. Al con-cluir que el voto directo de los colegiados era arcaico, obso-leto y antidemocrático, propuso un sistema de voto secreto mediante correo electrónico o correo regular.
Como vemos, las Leyes 121 y 135 no castigan al Colegio ni causan que desaparezca esa entidad, sino que regulan la estructura y el funcionamiento del Colegio y proveen los requisitos y procedimientos que se han de seguir para aque-llos abogados y aquellas abogadas que deseen afiliarse voluntariamente. El hecho de que las Leyes impugnadas enmendaran la ley que creó el Colegio y que algunos de sus miembros no estén de acuerdo con tal actuación, no signi-fica que las enmiendas son estatutos de proscripción como alega el recurrido. Por lo tanto, concluimos que las Leyes 121 y 135 no son estatutos de proscripción y procedía des-estimar la primera reclamación del Colegio.
B. Por estar íntimamente relacionadas, discutiremos en conjunto las alegaciones del recurrido en las reclama-ciones segunda y tercera. En estas aduce que las Leyes violan la norma de la separación de poderes, porque usur-pan el poder inherente del Tribunal Supremo para regla-mentar la profesión de la abogacía y se emiten órdenes e imponen deberes a éste. Asimismo, se alega que se preten-den revocar mediante “fiat legislativo las decisiones finales y firmes de Schneider I y Schneider II”.
El principio constitucional de separación de poderes emana de la See. 2 del Art. I de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 89 (1998). En Silva v. Hernández Agosto, 118 D.P.R. 45, 57 (1986), el Tribunal Supremo expresó sobre este principio lo siguiente:
... La teoría de la separación de poderes requiere que las facultades delegadas por el pueblo en la Carta Constitutiva se distribuyan entre las tres ramas. Su premisa es evitar la con-centración de poder en una sola. La relación entre los poderes *166 del Gobierno debe ser una dinámica y armoniosa. Su éxito depende de que cada una acepte y respete la autoridad de las otras y entienda la interrelación de sus funciones. Su perdu-rabilidad requiere que cuando haya un conflicto sobre el al-cance de los poderes constitucionales de cualquiera de ellas, los tribunales intervengan con prudencia y deferencia para aclarar los contornos de la Constitución y facilitar la resolu-ción de las diferencias.
Ese principio no pretende establecer una separación completa de poderes entre las tres ramas, sino un sistema de frenos y contrapesos que limita la acumulación desmedida de poder en una sola rama de gobierno. Colón Cortés v. Pesquera, 150 D.P.R. 724, 752 (2000). La división de los Poderes Legislativo, Ejecutivo y Judicial que establece nuestra Constitución no significa la independencia absoluta entre estos. Misión Ind. P.R. v. J.P., supra, pág. 89. Lo que se persigue es un equilibrio dinámico y delicado entre poderes coordinados y de igual rango y evitar, así, que ninguno de estos amplíe su autoridad a expensas de otro. Hernández Agosto v. Romero Barceló, 112 D.P.R. 407, 427-428 (1982). Se trata de un principio que debe aplicarse flexiblemente. Misión Ind. P.R. v. J.P., supra, pág. 112.
Por su parte, la Sec. 17 del Art. Ill de nuestra Constitución, L.P.R.A., Tomo 1, confiere a la Asamblea Legislativa la facultad de aprobar las leyes. Delgado, Ex parte, 165 D.P.R. 170, 193 (2005). Aun cuando se ha conferido a los tribunales la facultad de interpretar las leyes, estos tienen la obligación de respetar la voluntad legislativa, incluso en aquellos casos en los cuales discrepen personalmente de la sabiduría de los actos legislativos. Por lo tanto, las cortes deben abstenerse de sustituir el criterio del legislador por sus nociones de lo justo, razonable y deseable. Cuevas v. Ethicon Div. J & J Prof. Co., 148 D.P.R. 839, 850 (1999).
Al interpretar el alcance de las leyes, los tribunales debemos siempre considerar cuáles fueron los propó- *167 sitos legislativos para así garantizar su cumplimiento a la luz de los elementos que la motivaron. Es necesario tomar en cuenta que “[t]odo acto legislativo persigue unos propó-sitos: trata de corregir un mal, alterar una situación exis-tente, complementar una reglamentación vigente, fomen-tar algún bien específico o bienestar en general, reconocer o proteger un derecho, crear una política pública o formular un plan de gobierno, entre otros”. Departamento Hacienda v. Telefónica, 164 D.P.R. 195, 214 (2005). Como consecuencia, nuestra intervención será necesariamente limitada.
De otra parte, nuestra Constitución dispone, en su Art. V, Sec. 1, L.P.R.A., Tomo 1, que el Poder Judicial se ejercerá por el Tribunal Supremo y aquellos otros tribunales creados mediante legislación. Establece también que “[e]l Tribunal Supremo será el tribunal de última instancia en Puerto Rico”. Art. V, Sec. 3, L.P.R.A., Tomo 1, ed. 2008, pág. 412. En cuanto a la Rama Judicial, el principio de separación de poderes significa, en general, que la función judicial solo puede realizarse por esa Rama de Gobierno y las funciones no judiciales corresponden a los otros dos poderes. Colón Cortés v. Pesquera, supra, pág. 752.
Como consecuencia del principio constitucional de la se-paración de poderes, el Tribunal Supremo ha reafirmado que la función de admitir y remover abogados y abogadas de la práctica es de carácter inherentemente judicial, toda vez que es a la Rama Judicial a quien corresponde regla-mentar la profesión legal. In re Carrasquillo Ortiz, 163 D.P.R. 589, 592 (1997); In re Soto López, 135 D.P.R. 642, 646 (1994). Así, en Ex parte Jiménez, 55 D.P.R. 54, 55 (1939), en ocasión de resolver una controversia presentada por treinta y nueve personas que habían obtenido su diploma de abogado de la Universidad de Puerto Rico e im-pugnaban el requisito de aprobar el examen de reválida *168 para ser admitidos al ejercicio de la profesión, el Tribunal Supremo expresó:
La admisión de una persona al ejercicio de la abogacía es una función de carácter puramente judicial. Entre las faculta-des inherentes a la [R]ama [JJudicial de nuestro Gobierno está la de delimitar los requisitos que deberán cumplir y las cuali-dades que deberán reunir los solicitantes de una licencia para ejercer como abogados ante sus tribunales.
De igual forma, se ha reiterado que la facultad para regular el ejercicio de la profesión de abogado en Puerto Rico corresponde única y exclusivamente al Tribunal Supremo como tribunal de mayor jerarquía en la Rama Judicial. K-Mart Corp. v. Walgreens of P.R., Inc., 121 D.P.R. 633, 637 (1988). Cónsono con lo anterior, ese Foro ha resuelto que la legislación sobre la materia que puedan aprobar las otras ramas de gobierno es de carácter estrictamente directivo y no mandatorio. Colegio de Abogados de P.R. v. Schneider [I], supra, pág. 546; In re Bosch, 65 D.P.R. 248, 251 (1945).
En este caso, el recurrido sostiene que las Leyes violan la separación de poderes, porque usurpan el poder inhe-rente del Tribunal Supremo para reglamentar la profesión de la abogacía y se emiten órdenes e imponen deberes a este. No le asiste la razón.
Mediante la Ley 121 se cambió la colegiación compulso-ria de los abogados y las abogadas en nuestra jurisdicción establecida en la Ley 43 a una voluntaria, al disponerse que para ejercer esta profesión no era necesario que el abogado o la abogada estuviera afiliado o afiliada al Colegio. Conforme a lo anterior, se estableció que aquellos abogados y aquellas abogadas que no se colegiaran tendrían que pagar una anualidad al Tribunal Supremo, se fijó esa anualidad, cómo esta podría variarse y los usos que se le darían y se aproba-ron varias disposiciones relacionadas con el referido cambio de la naturaleza de la colegiación, de manera que ocurriera una transición ordenada por esta innovación. Según su Ex- *169 posición de Motivos, la Asamblea Legislativa consideró que era “imperante que todos los miembros de la profesión legal en Puerto Rico ... gocen de la misma representatividad en la entidad gremial que los agrupa ... [y] que el Colegio de Abo-gados de Puerto Rico fomente la participación efectiva de todos sus miembros”. En consecuencia, razonó que “no se justificaOba] la afiliación compulsoria para que [los abogados y abogadas] sigan siendo lo que son: hacedores y servidores fieles a una justicia inteligente y democrática”. Expuso que la acción legislativa para eliminar el requisito de la colegia-ción obligatoria “sirve a los mejores propósitos del desarrollo de la profesión jurídica de Puerto Rico”.
Por su parte, la Ley 135, esencialmente, cambió el pro-cedimiento de votación para elegir al Presidente y los de-legados por acumulación y regionales de la Junta de Go-bierno del Colegio y enmendó varias de las disposiciones de las Leyes 43 y 121. En la Exposición de Motivos de la Ley 135 se reconoció que, por la naturaleza estatutaria del Co-legio, resultaba necesario que este fuera un foro represen-tativo de la diversidad de ideas y pensamientos entre los abogados y las abogadas, y que se respetaran las diferen-cias de criterios y opiniones en distintos aspectos, inclu-yendo el ideológico y político. Asimismo, se destacó las ne-cesidades de reevaluar los mecanismos vigentes que databan de 1932 para la selección del Presidente y los de-legados por regiones y acumulación de la Junta de Go-bierno, y garantizar la participación de todos los abogados y las abogadas que voluntariamente pertenecieran al Cole-gio en la toma de decisiones. Al concluir que el voto directo de los colegiados era arcaico, obsoleto y antidemocrático, propuso un sistema de voto secreto mediante correo elec-trónico o correo regular.
De un examen de las Leyes surge que éstas no contie-nen disposición alguna que incida sobre el poder inherente del Tribunal Supremo para regular el ejercicio de la profe-sión legal en Puerto Rico. Esta legislación no incluye pre- *170 ceptos sobre la función del Tribunal Supremo de admitir y remover abogados y abogadas de la práctica de la profesión legal, las normas éticas que aplican a estos y estas o las reglas relacionadas con el ejercicio de la profesión de la abogacía en Puerto Rico. Tampoco vemos cómo las disposi-ciones específicas que el recurrido cuestiona, incluyendo las relacionadas con la forma mediante la cual el Tribunal Supremo fijará, modificará y utilizará la cuota que paga-rán los abogados no afiliados al Colegio y el número que utilizarán los abogados para identificarse en sus escritos en los tribunales, afecta la facultad de nuestro más alto Tribunal para reglamentar la profesión legal. Se trata de preceptos relacionados y necesarios para implantar el cam-bio de la colegiación de compulsoria a voluntaria. No con-sideramos que es una situación en la que una rama de Gobierno asume una función conferida a otra. Compárese Pueblo v. Santiago Feliciano, 139 D.P.R. 361 (1995).
Por lo tanto, opinamos que las Leyes no infringen el prin-cipio de la separación de poderes. De todos modos, si, como aduce el recurrido, esta legislación afectara el poder inhe-rente del Tribunal Supremo para regular a los abogados y a las abogadas, la legislación sería de carácter estrictamente directivo y no mandatorio, lo que no conlleva necesaria-mente que sea inválida. Véanse: Colegio de Abogados de P.R. v. Schneider [I], supra; In re Bosch, supra.
De otra parte, el recurrido sostiene que las Leyes pre-tenden revocar lo resuelto en Schneider [I] y Schneider [II]. Tampoco le asiste la razón.
En primer lugar, lo que se resolvió en Colegio de Abogados de P.R. v. Schneider [I], supra, págs. 546-547 y 550, fue que la colegiación compulsoria establecida mediante la Ley 43, al igual que la obligación de pagar la cuota de colegia-ción correspondiente, era válida. No vemos cómo este dic-tamen se revoca por la promulgación de las Leyes. En estas solo se cambia la naturaleza de la colegiación de compul-soria a voluntaria y, en forma alguna, se modifica o altera *171 lo que el Tribunal Supremo resolvió en ese caso. No se trata de una situación en la que una ley revisa una deci-sión judicial o cuando la parte que pierde un litigio obtiene una legislación que le permite continuar con una acción declarada ilegal por un tribunal, de manera que se inter-fiere impermisiblemente con el ejercicio del Poder Judicial. Véanse: Colón Cortés v. Pesquera, supra; Misión Ind. P.R. v. J.P., supra.
Contrario a lo aducido por el recurrido, consideramos que Schneider [I] apoya nuestra conclusión de que las Le-yes no infringen la separación de poderes. En ese caso dos abogados alegaron que la Legislatura carecía de facultad para establecer requisitos para el ejercicio de la abogacía porque esta facultad era exclusiva del Tribunal Supremo. Colegio de Abogados de P.R. v. Schneider [I], supra, pág. 543. El Tribunal Supremo resolvió que carecía de méritos esa alegación al determinar que:
Es inmeritorio el argumento de los querellados de que la Asamblea Legislativa de Puerto Rico carece de poder para or-denar, como hizo en 1932, la integración de nuestro foro. Es cierto, según hemos señalado repetidas veces, que la admisión al ejercicio de la abogacía es función inherente de este Tribunal y que la legislación aprobada sobre esta materia, tal como la Ley Núm. 43, “es puramente directiva, no mandatoria para esta Corte”.... La preeminencia de la acción judicial en este campo, el cual incluye naturalmente la facultad de pasar jui-cio sobre si debe unificarse o no el foro en una jurisdicción y bajo qué condiciones, no significa que la legislación sobre estos particulares que no conflija con las pautas que este Tribunal establezca sea nula. (Citas omitidas.) Id., pág. 546.
Así, se concluyó que era inmeritorio aducir que el legislador carecía de poder para ordenar la profesión legal. Por ende, aunque el Tribunal Supremo posee el poder inherente para reglamentar la profesión legal, ha reconocido la facultad de la Asamblea Legislativa para promulgar estatutos que respondan a la necesidad de atemperar el ejercicio de la profesión legal y, en consecuencia, no viola la separación de poderes legislación que cambie la colegiación *172 de los abogados y abogadas de obligatoria a voluntaria. Por lo tanto, se debieron desestimar las reclamaciones se-gunda y tercera del recurrido.
C. En la cuarta reclamación de la Petición Enmen-dada, el recurrido alega que la Ley 135 es nula porque infringe varios de los requisitos establecidos en la Sec. 17 del Art. Ill de nuestra Constitución, L.P.R.A., Tomo 1, sobre la redacción y el trámite de las leyes aprobadas por la Asamblea Legislativa. Específicamente sostiene que: (1) el título de la Ley 135 es defectuoso porque no expresa clara-mente el asunto que se añadió al proyecto de ley original para corregir errores de la Ley 121; (2) la Ley 135 contiene dos asuntos, los cuales no pueden tramitarse en solo un proyecto de ley, porque enmienda la Ley 43 para cambiar el sistema de votación para elegir al Presidente y a la Junta de Gobierno del Colegio y, a su vez, enmienda la Ley 121 para intentar corregir ciertos errores; (3) se enmendó el proyecto original para variar su propósito inicial de cam-biar los procesos de votación del Colegio e incorporar ma-terias extrañas a este al incluir enmiendas con el fin de corregir omisiones y errores de la Ley 121, y (4) la en-mienda al Art. 2 de la Ley 43, supra, tiene el defecto de que se utilizaron puntos suspensivos en todos sus incisos, lo que impide conocer el texto vigente.
La citada Sec. 17 del Art. Ill de nuestra Constitución, supra, ed. 2008, pág. 397, establece, en lo pertinente, lo siguiente:
No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título, y toda aquella parte de una ley cuyo asunto no haya sido expresado en el título será nula. ... Ningún proyecto de ley será enmendado de manera que cambie su propósito original o incorpore materias extrañas al mismo. Al enmendar cualquier artículo o sección de una ley, dicho artículo o sección será promulgado en su totalidad tal como haya quedado enmendado.
*173 Las disposiciones sobre el título y asunto de una ley incluidas en este precepto se aprobaron para impedir prác-ticas fraudulentas, facilitar la labor legislativa y vedar que grupos minoritarios incorporaran sus propuestas favoritas en una sola ley y se unieran para obtener una mayoría artificial que no existiría si cada propuesta se considerara por separado. A su vez, las disposiciones sobre enmiendas se promulgaron para complementar en parte los preceptos sobre el título y asunto y, además, para impedir que el legislador aprobara las enmiendas sin tener una noción clara de su alcance y significado. 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico 2584 — 2585 (ed. 2003).
Así, el Tribunal Supremo ha expresado que el propósito de las exigencias constitucionales sobre el título de un proyecto de ley “es informar al público en general y a los legisladores en particular el asunto que es objeto de la ley, de forma que el primero pueda oponerse a su aprobación si la considera lesiva y los segundos estén en condiciones de emitir su voto conscientes del asunto objeto de legislación”. Cervecería Corona, Inc. v. 98 D.P.R. 801, 812 (1970). No se requiere que el título de la ley tenga una descripción minuciosa de lo que se desea aprobar y es suficiente con que se exprese, en términos generales, el propósito del estatuto. Dorante v. Wrangler of P.R., 145 D.P.R. 408, 428 (1998).
Además, cuando la ley impugnada es enmendatoria, la norma, según se indica en Cervecería Corona, Inc. v. supra, pág. 812, es la siguiente:
Cuando se trata de una ley enmendatoria la doctrina preva-leciente no requiere que en el título se expongan los cambios específicos que se intentan en virtud de la enmienda pro-puesta, siempre que la materia no sea remota o extraña a la de la ley original. De forma que cuando la ley básica com-prende razonablemente la materia cubierta por la enmienda propuesta basta una referencia a la sección o artículo que se *174 intenta enmendar. Sólo cualquier materia o asunto de carácter sustantivo que no sea germano con la sección o artículo espe-cificado transgredirá la norma constitucional.
Dicho de otra manera, “siempre que materia enmenda-toria sea congruente con el asunto de la ley original, un título ... cumple con el requisito constitucional. A contrario sensu, si la materia enmendatoria constituye una clara desviación y un cambio completo del asunto de la ley original, en tales circunstancias un título como el indicado infringe el precepto constitucional”. Laboy v. Corp. Azucarera Saurí & Subirá, 65 D.P.R. 422, 428 (1945).
Al interpretar esta disposición constitucional, reiteradamente el Tribunal Supremo ha establecido “que solamente en un caso claro y terminante se justifica anular una ley por adolecer su título de deficiencias”. (Énfasis en el original.) Dorante v. Wrangler of P.R., supra, pág. 427. Véase, además, Cervecería Corona, Inc. v. J.S.M., supra, pág. 811; Rivera v. Corte, 62 D.P.R. 513, 540 (1943).
Como primer fundamento, el recurrido alega que el tí-tulo de la Ley 135 es defectuoso porque no expresa clara-mente el asunto que se añadió al proyecto de ley original para corregir errores de la Ley 121. Sostiene que en ese título sólo se señala que se cambió el proceso de elección de los oficiales del Colegio sin indicarse expresamente los otros cambios a varias leyes y, como se limita a enumerar disposiciones, ello no es suficiente aviso al legislador y el público. No tiene razón.
Primeramente, la Ley 135 enmienda las referidas Leyes 43 y 121, y la Ley Núm. 115 de 6 de mayo de 1941, según enmendada. De un examen del título de la Ley 135 surge claramente que en este se incluyen todos los artículos y las secciones de las leyes que se enmiendan, reenumeran, aña-den o derogan, y que sus disposiciones van dirigidas al funcionamiento y a la reestructuración del Colegio. Así, la Ley 135 cumple con el precepto constitucional, pues, según in-dicado, la normativa establece que el título de una ley no *175 tiene que contener una descripción minuciosa de lo que persigue y “es suficiente que en términos generales exprese su propósito; que sea un índice de su contenido .... [Y,] cuando la ley básica comprende razonablemente la ma-teria cubierta por la enmienda propuesta [,] basta una referencia a la sección o artículo que se intenta enmendar”. Cervecería Corona, Inc. v. supra, pág. 811. Por lo tanto, el título de la Ley 135 no es defectuoso y el recurrido no ha justificado invalidar ese estatuto por tal funda-mento.
En segundo lugar, el Colegio aduce que la Ley 135 con-tiene dos asuntos, por lo que no pueden tramitarse en sólo un proyecto de ley. Indica que, por un lado, se enmienda la Ley 43 para cambiar el sistema de votación para elegir al Presidente y la Junta de Gobierno del Colegio y, a su vez, se enmienda la Ley 121 para intentar corregir ciertos errores. Además, señala que los Arts. 9 y 18 de la Ley 135 (4 L.P.R.A. see. 774 n.), que establecen que las entidades que reciban fondos de la cuota fijada por el Tribunal Supremo tienen que tener total independencia del Colegio y prohíben a las entidades públicas pagar cuotas de aboga-dos afiliados al Colegio, respectivamente, no son germanas al fin de la Ley 135. Tampoco tiene razón.
El criterio para evaluar este planteamiento es si las dis-posiciones de la Ley 135 son germanas. Sobre este con-cepto, conocido como germaneness, se ha indicado lo si-guiente:
The general test used to determine whether the constitutional prohibition against plurality of subject matter has been violated is to decide whether the various provisions are germane to the subject presented in the title. “Germane” is defined as: in close relationship, appropriate, relevant or pertinent to the general subject. No portion of a bill not germane to the general subject can be given the force of law. The constitution is complied with if the various provisions relate to, and carry out the general purpose of an enactment. “When the subject is expressed in general terms, everything which is required to make a complete enactment in regard to it, or which results *176 as a compliment of the thought contained in the general expression, is included in and authorized by it.’ If there is any reasonable basis for grouping the various matters together and if the public will not be deceived, then the act will be sustained. The Oregon Supreme Court has said the court should examine the body of the act to determine whether the court can identify a unifying principle logically connecting all provisions in the act and if it is apparent in the act, then the court must look to the title to see if such a unifying principle is present. No accurate mechanical rule may be formulated by which the sufficiency of an act in relation to its title may be determined. Each case must be decided on its own peculiar facts. Yet care should be taken that the statute should not be construed narrowly or technically to invalidate proper and needful legislation.
Rational unity or a natural connection existed between trusts and powers of appointment, which meant the inclusion of the latter in statutes dealing with trust agreements did not violate the provision that no bill shall embrace more than one subject. In Alaska to comply with the “one-subject” rule all that is necessary is that matters treated in legislation fall under one general idea, be so connected with or related to each other, either logically or in popular understanding, as to be parts of, or germane to, one general subject. In that light the passage of a bill authorizing the sale of bonds for construction and improvement of certain correction facilities throughout the state and authorization for similar bonds for construction and improvement of certain public safety facilities did not violate the one-subject rule. In California which uses the broad reasonably germane test, the single subject requirement is met if the legislation exhibits a single scheme whereby its various provisions interrelate sufficiently to achieve a common underlying purpose. IAN. Singer, Statutes and Statutory Construction Sec. 17:3, págs. 18-27 (2002).
Conforme a lo anterior, se cumple con el requisito de germaneness si existe un concepto o tema central que cu-bra las disposiciones de la Ley 135. Esto es, los preceptos de ese estatuto son germanos si tienen una relación cer-cana, apropiada, relevante o pertinente al asunto general de la Ley 135 expresado en su título. Consideramos que las enmiendas incluidas en la Ley 135 constituyen asuntos germanos entre sí. Además, están relacionados con la ley sustantiva general que enmienda, la Ley 43.
Según indicado, por medio de la Ley 43 se creó y orga- *177 nizó el Colegio, lo que incluyó concederle ciertas facultades y deberes, y se estableció la colegiación compulsoria. Por su parte, mediante la Ley 121, entre otros asuntos, se redefi-nieron las referidas facultades y deberes del Colegio y se cambió a voluntaria la afiliación al Colegio. A su vez, la Ley 135 enmendó la Leyes 43 y 121 para, entre otras cosas, conceder discreción al Tribunal Supremo para cobrar una cuota a los abogados y a las abogadas, fijar la cuantía de esta, disponer las entidades a las que podían otorgarse los fondos devengados de esa cuota y que las entidades públi-cas podían pagar la cuota al Tribunal Supremo, establecer una nueva forma de votación para elegir al Presidente del Colegio y su Junta de Gobierno y aprobar los asuntos que se requiera sean refrendados por asamblea y establecer un proceso para cumplir con las medidas aprobadas.
Es claro que en la Ley 135 se incluyeron varios asuntos. Sin embargo, opinamos que esos asuntos están relaciona-dos entre sí y son consecuencia del cambio de la colegiación compulsoria a la afiliación voluntaria. Como señalamos, los asuntos se refieren, esencialmente, a cómo se pagará y utilizará la cuota que fije el Tribunal Supremo a los aboga-dos y las abogadas que no se afilien al Colegio y cómo este se organizará y operará según fue reestructurado por la Ley 121. Por ende, las disposiciones de la Ley 135 son ger-manas entre sí y se relacionan de manera cercana y perti-nente con la Ley 43, la que creó y organizó el Colegio y le otorgó sus deberes y funciones, y la Ley 121. En consecuen-cia, los asuntos incluidos en la Ley 135 se podían tramitar y aprobar en una sola medida legislativa.
En su tercer argumento, el recurrido indica que se en-mendó el proyecto original para variar su propósito inicial de cambiar los procesos de votación del Colegio y, al incluir enmiendas con el fin de corregir omisiones y errores de la Ley 121, se le incorporaron materias extrañas a este. In-dica que es contradictorio que luego de que se cambiara que la colegiación fuera voluntaria en vez de compulsoria, *178 que se le despojara de la prerrogativa de los cuerpos recto-res de cómo conducen sus votaciones. No le asiste la razón.
El citado precepto constitucional establece que un pro-yecto de ley no puede ser enmendado para cambiar su pro-pósito original o incorporar materias extrañas a este. En este sentido, en Rivera v. Corte, supra, pág. 539, el Tribunal Supremo expresó que el fin de esta disposición era
“impedir la inclusión en la ley de materia incongruente y extraña, y a la vez poner en guardia contra la inadvertencia, la ocultación y el fraude en la legislación,” o ... “evitar la prác-tica, corriente en todas las legislaturas donde no existe tal disposición, de incluir en la ley materias incongruentes que no tienen relación alguna entre sí o con el sujeto especificado en el título, a virtud de lo cual se aprueban medidas sin atraer atención que, si hubieran sido vistas, hubieran sido impugna-das y derrotadas. Así parece evitar sorpresas en la legisla-ción”. (Citando a Posados v. Warner, B. & Co., 279 U.S. 340 (1929), y Louisiana v. Pilsbury, 105 U.S. 278 (1881).)
De una lectura de la Ley 135 surge que, como hemos indicado, sus disposiciones no son extrañas entre sí y los asuntos contenidos en ella, incluyendo las enmiendas que se aprobaron del proyecto de ley original, no son incon-gruentes con las Leyes 43 y 121. Por el contrario, esta le-gislación trata sobre el cambio de la colegiación de los abo-gados de compulsoria a voluntaria y cómo funcionará el Colegio al amparo de este nuevo mecanismo. Por ende, la Ley 135 no adolece de la referida deficiencia que aduce el recurrido.
Finalmente, el Colegio señala que la enmienda al Art. 2 de la Ley 43 tiene el defecto de que se utilizaron puntos suspensivos en todos sus incisos, lo que impide conocer el texto vigente. Tampoco le asiste la razón.
En el citado precepto constitucional se establece que, al enmendar un artículo o una sección de un estatuto, ese artículo o sección se promulgará en su totalidad tal como haya quedado enmendado. De una lectura del Art. 1 de la Ley 135 (4 L.P.R.A. sec. 773) claramente surge que me- *179 diante este el legislador eliminó los incisos (f) y (g) del Art. 2 de la Ley 43, supra, y, considerando lo anterior, reenu-meró los restantes incisos para mantener la numeración secuencial de estos. Así, se cumplió con el requisito consti-tucional indicado.
En resumen, la Ley 135 no infringe la Sec. 17 del Art; III de nuestra Constitución, L.P.R.A., Tomo 1. Cierta-mente, no estamos ante “un caso claro y terminante [en el que] se justifica anular una ley por adolecer su título de deficiencias”. (Enfasis en el original.) Dorante v. Wrangler of P.R., supra, pág. 427. Véase, además, Cervecería Corona, Inc. v. supra, pág. 811; Rivera v. Corte, supra, pág. 540. Por lo tanto, no procede la cuarta reclamación del recurrido.
D. En las reclamaciones quinta y sexta el recurrido alega que las Leyes violan el derecho a la expresión y aso-ciación del Colegio y sus miembros. Sostiene que, como ahora es una asociación de membresía voluntaria, el Cole-gio se convirtió en una entidad privada a la que el Estado no puede imponerle restricción alguna que le afecte sus derechos a la libre expresión y asociación. Así, indica que la Legislatura no puede imponerle restricciones de cómo fun-cionar, tales como la forma en la que el Colegio fija y aprueba su cuota de colegiación, el efecto en la membresía por la falta de pago, el proceso para elegir al Presidente y sus delegados, cuándo se celebrarán las Asambleas y cómo estas se notificarán a sus miembros y cómo se establecerán las delegaciones de distrito. Asimismo, aduce que no se le pueden imponer los deberes que se establecen en la See. 7 de la Ley 121, supra, incluyendo el de establecer comisio-nes cuando se lo soliciten el Gobernador y la Asamblea Legislativa, porque así se utilizan los recursos del Colegio para fines públicos. Además, sostiene que no se le puede prohibir expresarse sobre idea política alguna ni determi-nar quienes pueden ser sus miembros y que esta legisla-ción restringe sustancialmente las actividades y facultades *180 del Colegio en perjuicio de sus miembros. Finalmente, in-dica que se vulneran estos derechos de sus miembros por-que, al imponerse la descolegiación, se privó a todos los abogados de su membresía en una organización que puede representarlos y a los abogados del servicio público se pro-híbe que sus cuotas puedan ser pagadas como resultado de su afiliación al Colegio. No tiene razón.
La See. 4 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, al igual que la Primera Enmienda de la Constitución Federal, L.P.R.A., Tomo 1, consagra el derecho de toda persona a la libre expresión. Este derecho fue concebido, entre otras razones, "para facilitar el desarrollo pleno del individuo y estimular el libre intercambio y la diversidad de ideas, elementos vitales del proceso democrático”. Velázquez Pagán v. A.M.A., 131 D.P.R. 568, 576 (1992). Como corolario de este derecho, la See. 6 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, reconoce el derecho de las personas a asociarse y organizarse para cualquier fin lícito con igual libertad. “Ambos derechos son fundamentales para la consecución y ejercicio de la libertad de conciencia lo que ... obliga [a los tribunales] a su más celosa protección.” Rodríguez v. Srio. de Instrucción, 109 D.P.R. 251, 255 (1979).
No obstante, estos derechos no son absolutos y pueden ser subordinados a otros intereses cuando la necesidad y conveniencia pública así lo requieran. Véase Mari Brás v. Casañas, 96 D.P.R. 15, 21 (1968). Por lo tanto, ambos de-rechos están sujetos a ciertas restricciones y su ejercicio debe realizarse de una manera moralmente responsable. Véase, Aponte Martínez v. Lugo, 100 D.P.R. 282, 290 (1971).
En el presente caso opinamos que el contenido y la apli-cación de las Leyes 121 y 135 no representan un esquema de expresión obligada que sea contrario a las libertades de expresión y asociación. El recurrido parte de la premisa equivocada de que el Estado, en el ejercicio de su poder de *181 reglamentación, no tiene la facultad para promulgar esta-tutos que regulen la estructura y operación del Colegio, porque asume que el legislador se está inmiscuyendo en el funcionamiento de una asociación privada.
No obstante, luego de que se aprobaran las Leyes 121 y 135 el Colegio continúa siendo como fue creado, una cria-tura legislativa, y por lo tanto, está sujeto a la regulación del Estado. Así, mediante el Art. 1 de la Ley 43 (4 L.P.R.A. see. 771 (ed. 2003)) el Colegio fue instaurado como una entidad jurídica o corporación cuasi pública al disponerse que:
Por la presente se constituye a los profesionales con derecho a ejercer la abogacía ante el Tribunal Supremo de Puerto Rico, siempre que la mayoría de aquéllos así lo acuerden en referén-dum que al efecto se celebrará según se dispone más adelante, en entidad jurídica o corporación cuasi pública bajo el nombre de Colegio de Abogados de Puerto Rico y con domicilio en la Capital.
En vista de que el Colegio es una entidad creada por la Asamblea Legislativa, esta tiene el poder de enmendar, mo-dificar, suplantar o derogar la ley que lo creó. Cf., Col. Ing. Agrim. P.R. v. A.A.A., 131 D.P.R. 735, 753-755 (1992); Pacheco Fraticelli v. Ontrón Antonsanti, 122 D.P.R. 229, 236 (1988). Ciertamente, las Leyes 121 y 135 no derogan la Ley 43 ni enmiendan el Art. 1 de ésta para convertir al Colegio en una entidad privada. En estas leyes esencialmente se determinó que para que un abogado pudiera ejercer su pro-fesión no se requería su afiliación compulsoria al Colegio y, sin cambiar la naturaleza de éste ni suprimirlo, variaron el mecanismo operacional del Colegio.
El recurrido sostiene que conforme cierta jurispruden-cia federal, una vez se constituyó mediante el referéndum ordenado en el citado Art. 1 de la Ley 43, la Asamblea Legislativa no tenía facultad legal para enmendar la fran-quicia corporativa del Colegio sin el consentimiento de este, ni enmendar sus facultades y deberes. Escrito suple- *182 mentario en oposición a la expedición de los autos de cer-tiorari solicitados, págs. 5-13. No le asiste la razón.
Primeramente, este argumento no fue presentado por el recurrido en el TPI, por lo que no puede aducirlo en alzada. Es norma establecida que este Tribunal no considerará se-ñalamientos no planteados por las partes a nivel de instancia. Véase Sánchez v. Eastern Air Lines, Inc., 114 D.P.R. 691, 696 (1983). Debido a que lo que alega el recu-rrido ante este Tribunal no fue lo que adujo en el TPI, no podemos atender su planteamiento.
De todos modos, hemos examinado esta alegación y no encontramos que tenga razón. En el caso Trustees of Dartmouth Coll. v. Woodward, 17 U.S. 518 (1819), citado por el recurrido, el Tribunal Federal resolvió que urna franquicia corporativa organizada con permiso de la Legislatura, apo-yada en gran parte por contribuciones voluntarias y mane-jada por oficiales y directores que no son representantes del Estado ni subdivisión política alguna, es una corpora-ción privada, aunque realizara trabajo caritativo o deberes semejantes a las corporaciones públicas protegida por el Art. 1, Sec. 10(1) de la Constitución federal, que establece que “[njingún estado ... aprobará ningún proyecto [de ley] ... que menoscabe la obligación de los contratos”. Const. EE. UU., L.P.R.A., Tomo 1, ed. 2008, pág. 169.
Por otro lado, en el caso citado por el Colegio, Andy’s Ice Cream, Inc. v. City of Salisbury, 724 A.2d 717, 732 (1999), el Tribunal de Apelaciones de Maryland señaló que:
Quasi-public corporations occupy the middle ground between public and private corporations, generally having the functions of the former and the structure of the latter. The Court of Appeals, in Potter v. Bethesda Fire Department, Inc., 309 Md. 347, 354, 524 A.2d 61 (1987), explained that a
“quasi-public corporation” is not per se public or governmental. On its face, the term connotes that it is not a public corporation but a private one. But “quasi” indicates that the private corporation has “some resemblance (as in function, effect or status)” to a public corporation. ... “Quasi” bespeaks “that one subject resembles another ... in certain *183 characteristics, but that there are intrinsic and material differences between them.” [Omitting citations to dictionaries].
... For instance, quasi-public corporations are usually wholly private companies acting for public benefit. “A quasi-public corporation is, by its very words, not a public corporation, and thus is a private corporation. But the word ‘quasi’ ... denotes that it has the characteristic of a public corporation in function, effect or status.” Potter, 309 Md. At 357 (citing 1 W. Fletcher & C. Swearingen, Cyclopedia of the Law of Private Corporations § 63 at 600 (1983.Rev.Vol.)).
Sin embargo, este no es el caso que aquí nos ocupa. Se-gún indicado, el Colegio es una entidad cuasipública creada mediante el citado Art. 1 de la Ley 43 y las Leyes impugnadas no enmendaron ese artículo para convertirlo en una entidad privada. Además, opinamos que las facul-tades que el legislador le concedió al Colegio lo ubican en una posición particular en el esquema social del país lo que lo diferencia de una corporación privada. Acorde con lo anterior, y dada la naturaleza cuasi pública del Colegio, en-tendemos que la Asamblea Legislativa está facultada para proponer cambios en la Ley que creó al Colegio. Por lo tanto, se equivoca el recurrido al señalar que el Colegio es una entidad privada, cuya franquicia no puede ser modifi-cada por la Asamblea Legislativa sin el consentimiento del Colegio.
De otra parte, el recurrido aduce que es contrario a las libertades de expresión y asociación la obligación que se le impuso en el nuevo Art. 13(6) de la Ley 43, aprobado en la See. 7 de la Ley 121 (4 L.P.R.A. sec. 772), de responder a las peticiones del Gobernador y la Asamblea Legislativa de crear comisiones de investigación y consulta, porque se uti-lizan recursos de una “asociación privada” para promover fines públicos y el Colegio tiene la libertad de escoger los asuntos en los cuales expresarse. Además, alega que no se le puede impedir expresarse sobre ideas políticas como se dispone en el nuevo Art. 13(7) de la Ley 43, supra, porque ello viola la libertad de expresión. No tiene razón.
En primer lugar, según indicado, el legislador tiene la *184 prerrogativa de fijar tal deber y establecer las limitaciones a las facultades del recurrido que entienda necesarias, por-que el Colegio es una criatura de la Asamblea Legislativa. Además, en esta legislación se reconoció que la misión de administrar la justicia recae principalmente en los miem-bros de la profesión legal, por lo que, al participar en los procesos públicos, los abogados cumplen su responsabili-dad de que se mantenga un orden jurídico íntegro y eficaz. Preámbulo de los Cánones de Ética Profesional de Puerto Rico, 4 L.P.R.A. Ap. IX. Por lo tanto, mediante las Leyes válidamente se le podían imponer las obligaciones indica-das al Colegio.
De todos modos, en el nuevo Art. 13(6) de la Ley 43, aprobado en la Ley 121, se dispuso que, al emitir sus eva-luaciones e informes requeridos por cualquiera de las tres Ramas del Gobierno, el Colegio “tendrá total y absoluta independencia para recomendar y asumir aquella postura que mejor entienda responde a sus propósitos y deberes así como a los mejores intereses del Pueblo de Puerto Rico”. Así, aim cuando le cobijaran los derechos que aduce el Co-legio, la propia ley le concede independencia absoluta para asumir la posición que entienda procedente y de forma al-guna se afectan tales derechos. Además, según el nuevo Art. 13 de la Ley 43, supra, el Colegio tiene la facultad para “[establecer y crear comisiones permanentes y tem-poreras de investigación y consulta en aquellas ocasiones que su Junta de Gobierno así lo apruebe con el fin de pro-mover sus objetivos y obligaciones”. Finalmente, resalta-mos que, en el anterior Art. 13(2) de la Ley 43, supra, se imponía al Colegio la obligación de “evacuar los informes y consultas que el Gobierno le reclame”, deber que es similar al aquí impugnado por el recurrido y que, a nuestro mejor entender, no fue cuestionado anteriormente por el Colegio.
Los otros señalamientos del recurrido se refieren a la “descolegiación”, los requisitos y procedimientos que tienen que seguir los abogados y las abogadas que elijan cole- *185 giarse y el pago de la cuota. Un examen de las Leyes cla-ramente demuestra que éstas no coartan el derecho a asociarse. Por el contrario, los cambios establecidos en esta legislación abonan al derecho a la libertad de asociación, porque provee a los abogados y las abogadas la libertad de ser miembros de la entidad que prefieran. Además, no se impuso una cuota anual específica al permitir que “aque-llos abogados y abogadas que opten por afiliarse al Colegio de Abogados pagarán la cuota establecida por dicha asociación”. Sec. 10 de la Ley 121, según enmendada por el Art. 6 de la Ley 135. De igual modo, la regulación sobre el proceso en que se llevará a cabo la colegiación voluntaria y el cobro de la cuota son disposiciones razonables sobre los procesos necesarios para que el Colegio pueda manejar el cambio de la colegiación compulsoria a voluntaria y los abogados y las abogadas puedan conocer el procedimiento con el que deben cumplir. Asimismo, el término fijado para cobrarla sirve de aliciente e imparte certeza para los abo-gados y las abogadas que deseen colegiarse. Por lo tanto, procedía desestimar las reclamaciones quinta y sexta del Colegio.
E. En la séptima reclamación, el recurrido plantea que la Leyes son inconstitucionales, porque violan el derecho a la igual protección de las leyes. Argumenta que el Estado no puede cumplir con su obligación de probar que existe un interés público apremiante que justifique la clasificación y que esta es necesaria para promover ese interés, por lo que no se cumple el criterio estricto o riguroso, y tampoco existe un nexo racional entre las medidas legislativas y un fin legítimo del Estado al aprobarlas. No tiene razón.
El Art. II, Sec. 7 de nuestra Constitución, L.P.R.A., Tomo 1, prohíbe que se le niegue a una persona la igual protección de las leyes. Esta garantía se activa al evaluar una legislación que crea clasificaciones entre grupos, discriminando con respecto a unos frente a otros. Esa cláusula, sin embargo, no impide que el Estado establezca *186 clasificaciones para descargar adecuada y eficientemente sus funciones ni exige un trato igual a todos los ciudadanos. Solo prohíbe un trato desigual e injustificado. Por ello, el Estado puede establecer clasificaciones siempre que ellas sean razonables y estén dirigidas a alcanzar o proteger un interés público legítimo. Asoc. Academias y Col. Cristianos v. E.L.A., 135 D.P.R. 150, 167 (1994).
Para decidir si una clasificación cumple con esta garantía constitucional, la clasificación se evalúa dependiendo de la naturaleza de los derechos afectados, según el escrutinio estricto o el mínimo. Zachry International v. Tribunal Superior, 104 D.P.R. 267, 277 (1975). El estricto aplica a las clasificaciones sospechosas —las fundamentadas en raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas y nacionalidad— o cuando la clasificación afecta el ejercicio de un derecho de arraigo constitucional. Asoc. Academias y Col. Cristianos v. E.L.A., supra, pág. 168. Si este criterio aplica, la ley se presume inconstitucional y corresponde al Estado probar que la clasificación responde a un interés estatal apremiante y es necesaria para promover ese interés; esto es, no existe un medio menos oneroso para alcanzarlo. San Miguel Lorenzana v. E.L.A., 134 D.P.R. 404, 425 (1993).
Por su parte, el escrutinio mínimo se utiliza cuando el estatuto es de naturaleza socioeconómica. Según este es-crutinio se presume la constitucionalidad de la clasifica-ción y corresponde a quien la impugna demostrar que la ley es claramente arbitraria y no existe nexo racional al-guno entre esta y un interés legítimo del Estado. M. & B. S., Inc. v. Depto. de Agricultura, 118 D.P.R. 319, 333 (1987).
En el presente caso la legislación impugnada es de tipo socioeconómico, por lo que se evalúa mediante el escrutinio mínimo o de nexo racional entre el propósito legislativo y la clasificación impugnada. El recurrido sostiene que las Leyes son inválidas porque varias de sus disposiciones, como los requisitos sobre la cuota anual y los deberes que *187 se le imponen, tratan al Colegio de forma distinta a las demás asociaciones de profesionales en Puerto Rico. No obstante, el recurrido no especifica cómo tal legislación es-tablece un trato desigual e injustificado frente a otras per-sonas en igual situación. Tampoco ha demostrado que la clasificación sea arbitraria, ni la ausencia de un nexo ra-cional entre la clasificación y el interés legítimo que se quiere proteger, por lo que tenemos que concluir que esta legislación no viola la igual protección de las leyes. San Miguel Lorenzana v. E.L.A., supra, pág. 426; M. & B. S., Inc. v. Depto. de Agricultura, supra, pág. 333.
De todos modos, el interés que se persigue con las Leyes es, según indicado, garantizar a los miembros de la profe-sión legal en Puerto Rico la igualdad de condiciones y re-presentatividad en la entidad que los agrupa, que esta re-presente la diversidad de ideas y pensamientos de los abogados y las abogadas, y asegurar la participación de estos y estas en la toma de decisiones del Colegio, lo que constituye un interés legítimo del Estado. Por lo tanto, las Leyes no violan la igual protección de las leyes porque existe racionalidad entre estas y el propósito legislativo, y no establece un trato desigual o discriminatorio a los miem-bros del Colegio.
F. Finalmente, en la octava reclamación el recurrido alega que las Leyes son inconstitucionales porque menos-caban la relación contractual entre el Colegio y sus miembros. Sostiene que mediante esta legislación se modi-ficaron varias disposiciones del Reglamento del Colegio, el cual constituye el contrato entre este y sus miembros, sin existir un interés legítimo que justificara ese menoscabo. Así, señala que: la See. 7 de la Ley 121 trastoca cómo se crean las comisiones temporales del Colegio y le impone el deber de crear comisiones cuando lo requiera una de las Ramas de Gobierno, no cuando su Presidente o Junta de Gobierno lo estimen necesario; los Arts. 3 y 4 de la Ley 135 (4 L.P.R.A. secs. 777 y 778) modifican el proceso para se- *188 leccionar los puestos electivos del Colegio y aprobar reso-luciones y le imponen el voto electrónico; el Art. 19 de la Ley 135, supra, usurpa la facultad de su Asamblea General para enmendar el reglamento del Colegio, porque ordena que la Junta de Gobierno apruebe los reglamentos necesa-rios para la implantación de la Ley, y la See. 4 de la Ley 121 impone una moratoria de cinco años para aumentar la cuota de colegiación y establece el procedimiento aplicable. No tiene razón.
La See. 7 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, ed. 2008, pág. 296, establece, en lo pertinente, que: “No se aprobarán leyes que menoscaben las obligaciones contractuales.”
Esta disposición no constituye una prohibición absoluta que impide el poder de reglamentación del Estado para beneficio del interés público. Bayrón Toro v. Serra, 119 D.P.R. 605, 619 (1987); Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378, 394 (1973). No todo menoscabo de una obligación contractual es contrario a la prohibición constitucional. Bayrón Toro v. Serra, supra, pág. 619.
Esta garantía tiene su fundamento racional en que debe haber certeza en las consecuencias legales de lo contratado. Así, una ley no debe modificar esas consecuencias en perjuicio de uno de los contratantes, porque las partes así lo confían. Warner Lambert Co. v. Tribunal Superior, supra, pág. 395.
Al considerar la validez de una ley conforme este pre-cepto constitucional aplica el criterio de razonabilidad. En ese sentido, el tribunal tiene que establecer un balance ra-zonable entre el interés social de promover el bien común y el de proteger las transacciones contractuales contra la aplicación arbitraria e irrazonable de los estatutos. Bayrón Toro v. Serra, supra, pág. 620.
La razonabilidad de la ley se determina considerando principalmente la sustancialidad del interés público pro-movido por el estatuto y la magnitud del menoscabo cau- *189 sado por su aplicación retroactiva. Warner Lambert Co. v. Tribunal Superior, supra, pág. 396. Si el menoscabo ocurre como consecuencia de una modificación razonable y nece-saria para adelantar un interés público, el tribunal sosten-drá su validez. Bayrón Toro v. Serra, supra, pág. 621.
En este caso, según indicado, el Colegio es una criatura legislativa, no una asociación privada. Por lo tanto, no puede sostenerse que existe un contrato entre partes priva-das al cual aplique el citado precepto constitucional.
De todas maneras, aun cuando se considerara que la relación entre el Colegio y sus miembros es un contrato entre partes privadas, este se entiende renovado anual-mente mediante el pago de la cuota. Así, los abogados y las abogadas que deseen formar parte de esa entidad pueden acogerse voluntariamente, siguiendo el procedimiento pre-ceptuado mediante legislación.
Además, en las exposiciones de motivos de las Leyes impugnadas se establecen amplios fundamentos que justi-fican la razonabilidad de tales medidas legislativas. En ese sentido, el Colegio fue concebido como parte de un esquema legislativo para que un abogado o una abogada pudiera ejercer su profesión y el origen legislativo para la práctica de la abogacía fue reevaluado, atemperándolo a una reali-dad histórica que demostraba que no existía justificación para requerir una colegiación compulsoria. Por lo tanto, se debió desestimar esta reclamación.
En resumen, consideradas las reclamaciones plantea-das por el Colegio, concluimos que no existía impedimento para desestimarlas, según fue solicitado al TPI y éste inci-dió al así no proceder. Por lo tanto, procede revocar el dic-tamen recurrido.
IV
Por los fundamentos expresados, se expide el auto de “certiorari”, se revoca el dictamen recurrido y se desestima la petición enmendada del recurrido. Adelántese inmedia- *190 tamente por correo electrónico, telefax o teléfono y notifí-quese posteriormente por la vía ordinaria.
Lo acordó y manda el Tribunal y lo certifica la Secreta-ria del Tribunal.
(.Fdo.) Dimarie Alicea Lozada

Secretaria del Tribunal de Apelaciones

*) La norma según la Primera Enmienda de la Constitución de Estados Unidos se ha resumido así:
“A court must conduct a balancing analysis to determine the legitimacy of a regulation that infringes upon a constitutional right. Courts weigh the regulatory burdens placed on individuals’ rights against state interests that the regulation seeks to promote. When the regulation imposes severe burdens on the aggrieved party’s rights, a court strictly scrutinizes the asserted state interest.
“Under a strict scrutiny analysis, the state must narrowly tailor the regulation to meet compelling state interests. Courts undertake a less exacting review when the regulation imposes only minimal burdens on constitutional rights. This intermediate scrutiny only requires the state to assert important, but not necessarily compelling, state interests to justify the regulation.
“Because freedom of association is a fundamental right, courts often require applying strict scrutiny analysis to laws that infringe upon it. Courts, however, do not always apply strict scrutiny, especially when the law imposes only minimal burdens on individuals’ or political parties’ rights. As a result, courts focus their analysis on how much the state’s regulation burdens associational rights in order to determine which level of scrutiny to apply.” (Escolios omitidos.) D. Chase, Note: Clingman v. Beaver: Shifting Power from the Parties to the States, 40 U.C. Davis L. Rev. 1935, 1942-1944 (2007).

 Como Exhibit 1 se presentó el Informe positivo sobre el P. de la C. 152 de la Comisión de lo Jurídico y de Ética de la Cámara de Representantes y como Exhibit 2 las ponencias de la Directora Administrativa ante la Comisión de lo Jurídico y de Ética de la Cámara de Representantes de 27 de marzo de 2009 y la Comisión de Seguridad Pública y Asuntos de la Judicatura del Senado de 2 de septiembre de 2009.

 Estas son:
“(1) Si las Leyes 121 y 135 despojan o no al Colegio de Abogados de Puerto Rico de sus miembros. ...
“(2) Si las Leyes 121 y 135 imponen o no un castigo al Colegio de Abogados de Puerto Rico dentro del significado tradicional de un castigo legislativo. ...
*155 “(3) Si la prohibición de recibir el dinero producto de la venta de sellos forenses le causan o no al Colegio de Abogados de Puerto Rico un daño que afecta su fondo para la provisión de asistencia legal a indigentes. ...
“(4) Si las Leyes 121 y 135 le causan o no un daño al Colegio de Abogados de Puerto Rico al prohibirle a los municipios y otras entidades del ELA pagar la cuota de colegiación a sus empleados.
“(5) Si las Leyes 121 y 135 tienen o no propósitos legislativos punitivos. ...
“(6) Si las limitaciones impuestas por las Leyes 121 y 135 al Colegio de Aboga-dos violan o no la separación de poderes de nuestro sistema republicano de gobierno.
“(7) Si los historiales legislativos de las Leyes 121 y 135, que no han sido some-tidos en su totalidad, evidencian o no una intención de castigar al Colegio de Aboga-dos. ...
“(8) Si las Leyes 121 y 135 usurpan o no el poder inherente del Tribunal Supremo de Puerto Rico para reglamentar la profesión de la abogacía en Puerto Rico.
“(9) Si las Leyes 121 y 135 violan o no el derecho de libertad [de] expresión del Colegio de Abogados de Puerto Rico garantizado por la Constitución del Estado Libre Asociado de Puerto Rico y la Primera Enmienda a la Constitución de los Estados Unidos. ...
“(10) Si las Leyes 121 y 135 violan o no el derecho de libertad de asociación del Colegio de Abogados de Puerto Rico garantizado por la Constitución del Estado Libre Asociado de Puerto Rico y la Primera Enmienda a la Constitución de los Estados Unidos. ...
“(11) Si las Leyes 121 y 135 violan o no el derecho de libertad [de] expresión de los miembros del Colegio de Abogados de Puerto Rico garantizado por la Constitución del Estado Libre Asociado de Puerto Rico y la Primera Enmienda a la Constitución de los Estados Unidos. ...
“(12) Si las Leyes 121 y 135 violan o no el derecho de libertad de asociación de los miembros del Colegio de Abogados de Puerto Rico garantizado por la Constitución del Estado Libre Asociado de Puerto Rico y la Primera Enmienda de la Constitución de los Estados Unidos. ...
“(13) Si las Leyes 121 y 135 violan o no el derecho constitucional del Colegio de Abogados de Puerto Rico a la igual protección de las leyes garantizado por la Cons-titución del Estado Libre Asociado de Puerto Rico y la Quinta Enmienda y/o Decimo-cuarta Enmienda a la Constitución de los Estados Unidos. ...
“(14) Si las Leyes 121 y 135 menoscaban o no la relación contractual entre el Colegio de Abogados y sus miembros.” Apéndice, págs. 437-439.

 ei XPI también indicó que en el expediente no existía estipulación alguna de las partes sobre los hechos. Sin embargo, según indicado, en el Documento Conjunto se incluyeron treinta estipulaciones de hechos.

 En Nixon v. Administrator of General Services, 433 U.S. 425 (1977), el Tribunal Supremo Federal (Tribunal Federal) expresó que la interpretación que se le confiere a la prohibición de un estatuto de proscripción no puede ser llevada a tal extremo que se entienda que cualquier ley que imponga a un grupo o individuo soportar una carga que éstos detestan, deba ser considerada como un estatuto de proscripción. Razonó que argumentar que un individuo o un grupo definido es pros-crito (attainted) siempre que es obligado a soportar cargas las cuales desaprueban, eliminaría la relación entre la garantía constitucional contra esas leyes y los concep-tos realistas de clasificación y castigo y paralizaría el proceso legislativo, porque cualquier individuo o grupo que sea el sujeto de legislación adversa podría quejarse de que los legisladores pudieron y debieron haber definido a la clase afectada con un mayor grado de generalidad. íd., pág. 470. Además, expuso que, si bien la cláusula constitucional contra un estatuto de proscripción sirve como un baluarte importante contra la tiranía, no se logra ese fin limitando a la Legislatura a solamente poder legislar para todos, aprobar leyes que sólo son beneficiosas o no legislar. íd., pág. 471.